# IN RE SHAWN S. ET AL.*
## (SC 16639)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 23—officially released December 17, 2002

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Douglas M. Crockett*, with whom were *Anne Louise Blanchard* and, on the brief, *Betty J. Gailor*, for the appellants (respondents).

*Susan Quinn Cobb*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Eliot D. Prescott* and *Mark F. Kohler*, assistant attorneys general, for the appellee (petitioner).

*Maria Morelli-Wolfe* filed a brief for Greater Hartford Legal Assistance et al. as amici curiae.

*Opinion*

ZARELLA, J. The respondents, the parents of S and D, their minor children, appealed to the Appellate Court from the judgments of the trial court committing S and D to the custody of the commissioner of children and families (commissioner). The Appellate Court dismissed the appeals on the ground that the respondents had failed to exhaust their administrative remedies. *In re Shawn S.*, 66 Conn. App. 305, 313, 784 A.2d 405 (2001). Thereafter, we granted the respondents' petition for certification limited to the following issue: "Did the Appellate Court properly dismiss this appeal on the ground of failure to exhaust administrative remedies?" *In re Shawn S.*, 258 Conn. 948, 788 A.2d 97 (2001). The sole issue in this certified appeal is whether the Appellate Court properly concluded that the respondents were required to exhaust their administrative remedies. We affirm the judgment of the Appellate Court on alternate grounds.

The record discloses the following facts and procedural history that are relevant to this appeal. On Febru-

ary 17, 1999, the commissioner filed separate petitions, pursuant to General Statutes § 46b-129,[1] seeking the commitment of S and D, who are autistic. The petitions alleged that S, born in 1991, and D, born in 1987, were neglected by being denied the proper physical, emotional, educational and moral care, and that they were living under conditions, circumstances or associations injurious to their well-being. The petitions further alleged that S and D were uncared for because their home could not provide the specialized physical, emotional or mental care that the children required.

In support of the commitment petitions, the petitioner offered the following reasons for commitment. "The [d]epartment of [c]hildren and [f]amilies [department] has had involvement with this family dating back to September of 1997. There have been three referrals made on this family.

---

[1] General Statutes § 46b-129 (a) provides: "Any selectman, town manager, or town, city, or borough welfare department, any probation officer, or the Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the Superior Court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (k) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the Commissioner of Children and Families of the time and place when the petition is to be heard not less than fourteen days prior to the hearing in question." In 1999, when the petitions were filed, § 46b-129 (a) referred to subsection (d) of General Statutes § 17a-112, rather than to subsection (k) of that statute, to which § 46b-129 (a) now refers.

"On September 10, 1997 the [d]epartment received a referral alleging neglect due to inadequate supervision of both [D and S]. The caller reported that the children are left unsupervised on a daily basis and that both children are autistic. The caller reported that on September 10, 1997 [D] was in the road on his Big Wheel aiming it at oncoming vehicles and the caller nearly hit him. During the course of the investigation there were also concerns raised that the children were sitting behind parked cars. The case was opened with neglect confirmed with concerns of supervision of the children.

"On November 14, 1998 a referral was made by Ms. Denise Panosky, of the Pequot Medical Center. Ms. Panosky reported that [D] was brought into the [emergency room] for examination of his chin, which had a very large laceration on it and a large bruise on his groin area. The child was brought in by [the department of mental retardation] [e]astern [r]egion as the child was in respite for the weekend. The child should have had stitches, but by the time that they brought him in for treatment it was too late. The [respondents] reported that they were unaware as to where the bruise came from.

"During the investigation, the school nurse at Colonel Ledyard reported to the [d]epartment that [S] came to school with a large bite on his finger from his brother, and had been hospitalized for a high dose of Tegretol. The [respondents] did not have the bite examined as suggested by the school nurse. Given the lack of medical follow up in the two instances during the investigation the case was opened for treatment services with neglect substantiated.

"Both of these children suffer from autistic disorders. They are extremely difficult to handle. They are nonverbal and communicate using mostly body movements, and little sign language. Providers have noted that [S']

behaviors are becoming more out of control. Providers have concerns that the children can not be managed in the home for much longer. Mother has the major caretaking responsibilities and reports that she is 'burned out'. Mother has stated that she feels that placement is needed for [D]. At this time it does not appear that the home is offering the amount of structure needed.

"Reasonable Efforts: During the course of this family's involvement with the [d]epartment . . . numerous services have been offered including casework services, parent aide services, Intensive Family Preservation Program, [d]epartment . . . respite services, respite services through [the department of mental retardation], and behaviorist services through [the department of mental retardation]. There has been little follow through with most services as the [respondents] seem to be most interested in respite services. It is apparent that mother has reached her tolerance level with [S and D]. There are concerns with the supervision of these children as they require constant supervision. Given the history of the family, specifically the lack of follow through with services, and few gains made, it is apparent that intensive services/court involvement are necessary to elicit cooperation from [the respondents] and to ensure the safety and well being of their children."

In response to the commissioner's petitions, the respondents filed motions for injunctive relief requesting that the court order the commissioner to provide appropriate residential placements for S and D and enjoin the commissioner from pursuing commitment of the children. The bases for the respondents' motions for injunctive relief were that: (1) granting the commitment of the respondents' children would violate the respondents' constitutional rights; and (2) the petitions for commitment, which ostensibly were to provide services and residential placement for the children, con-

ditioned the provision of department services on commitment in violation of General Statutes § 17a-129.[2] In their motions, the respondents affirmed that they were not contesting the allegation that S and D were "uncared for" as defined by General Statutes (Rev. to 1999) § 46b-120 (9).[3]

Thereafter, the court heard testimony on the commissioner's petitions. The respondent mother entered an unconditional plea of nolo contendere that S and D were uncared for because of their special needs.[4] The court canvassed the respondent mother to confirm that she understood that the plea would operate as a waiver of her right to challenge the allegations that the children were uncared for.[5] The court found that the plea was

---

[2] General Statutes § 17a-129 provides in relevant part: "Commitment to or protective supervision or protection by the department shall not be a condition for receipt of services or benefits delivered or funded by the department."

[3] General Statutes (Rev. to 1999) § 46b-120 provides in relevant part: "(9) [A] child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires. For the purposes of this section the treatment of any child by an accredited Christian Science practitioner in lieu of treatment by a licensed practitioner of the healing arts, shall not of itself constitute neglect or maltreatment . . . ."

[4] The respondent father was on active duty with the United States Navy and was therefore unavailable. The court stated that it would not enter a default judgment against the father or sanction him because of his military obligations. The court inquired as to whether the father was in agreement with the plea. The respondent mother indicated that he was in agreement. Therefore, the court found that, procedurally, the father was standing mute, noting that the father was not contesting the matter.

[5] The following colloquy occurred between the court and the respondent mother:

"The Court: All right. . . . [T]he petition dated February 16, 1999, the state of Connecticut alleges that your two sons, [S] and [D] are uncared for as defined in our state statutes. Specifically what they're saying is that both boys as a result of their physical, emotional and mental condition require specialized care, which your home cannot provide. Now, in connection with this you have submitted a written plea of nolo contendere. Is it your understanding that by filing this plea you're telling the judge that you're not admitting any of the state's claims, but I'm not going to contest this matter. Is that your understanding, ma'am?

## voluntarily, knowingly and intelligently made with the

"[Respondent Mother]: Yes, Your Honor.

"The Court: Okay. Have you taken any alcohol, medicine or drugs today? Yourself?

"[Respondent Mother]: Me?

"The Court: Yes.

"[Respondent Mother]: I take one asprin and I'm on a high blood pressure medicine.

"The Court: Okay. And that medication or does that medication interfere with your ability to understand people or communicate your thoughts to others?

"[Respondent Mother]: No.

"The Court: All right. And have you had enough time to discuss your plea and these proceedings with Attorney [Douglas M.] Crockett?

"[Respondent Mother]: Yes.

"The Court: Has he explained to you what they are all about?

"[Respondent Mother]: Yes.

"The Court: Counselor, have you reviewed the facts and the elements with your client?

"Mr. Crockett [attorney for the respondent mother]: Yes, I have, Your Honor.

"The Court [addressing the respondent mother]: And . . . have you discussed this matter fully with your husband?

"[Respondent Mother]: Yes.

"The Court: All right. And he's in agreement with today's proposed course of action, the adjudication?

"[Respondent Mother]: Yes.

"The Court: All right. And the only reason he is not here today is because of his military assignment?

"[Respondent Mother]: Yes.

"The Court: All right. Now, do you understand, ma'am by filing this plea you are giving up your right to remain silent. You're giving up your right to have a trial before a judge to make the state prove by the fair preponderance of the evidence that the boys are uncared for with specialized needs. You're giving up your right to see and hear all of that evidence and to have your lawyer question every witness. Do you understand that?

"[Respondent Mother]: Yes.

"The Court: All right. Are you doing this voluntarily? That is, giving up your rights and agreeing to the adjudication?

"[Respondent Mother]: Yes.

"The Court: Okay. Counsel know of any reason I should not accept the plea?

"Mr. [William J.] Wholean [Assistant Attorney General]: No, sir.

"Mr. Crockett: No, Your Honor.

"The Court: Okay. The court finds that the plea of nolo contendere submitted by [the respondent mother] was submitted voluntarily. It was understand-

assistance of counsel. Accordingly, the court adjudicated both S and D as uncared for with specialized needs. The case was then continued for disposition pending evidentiary hearings on placement options and available services.

At the hearing on the commitment petition, the trial court, by reference to a status report, indicated that S and D were capable of being placed at the Devereaux School in West Chester, Pennsylvania. In light of the ability immediately to place S and D, the respondents asked that their motions for injunctive relief be marked off, allowing an order of commitment to be entered unchallenged, and allowing the children to be placed at the facility the next day. The respondents expressed that they were unhappy to have their children committed, but that commitment was the only available means to secure services for their children. In entering the order of commitment, which was effective March 8, 2000, the court found that the order was not a result of any fault of the respondents. The court further found that there had been no determination that the respondents had been neglectful, but rather that S and D have specialized needs that could no longer be addressed in the home.

The respondents then filed a separate appeal for each child from the judgment of the trial court to the Appellate Court, making the exact same claims that they had made in their motions for injunctive relief, which had been marked off at the final commitment hearing. Specifically, the respondents claimed that the commitments violate the prohibitions against: (1) conditioning the provision of services on commitment as set forth in § 17a-129; (2) unwarranted state interference in family

---

ingly and intelligently made with the assistance of competent counsel. There's a factual basis for it. Accordingly, it is accepted and [D and S] are adjudicated . . . uncared for with specialized needs."

relationships as embodied in the Connecticut constitution, in article first, §§ 1 and 10 and article first, § 20, as amended by articles five and twenty-one of the amendments; and (3) unwarranted state interference in family relationships as embodied in the ninth and fourteenth amendments to the United States constitution. *In re Shawn S.*, supra, 66 Conn. App. 306. The commissioner challenged the Appellate Court's subject matter jurisdiction, claiming that the respondents: (1) had failed to exhaust their administrative remedies; and (2) were not aggrieved by the order of commitment. Id., 307. In response, the respondents asserted that to resort to administrative remedies would be futile because the department: (1) lacks the authority to revoke the commitment; (2) has failed to promulgate the necessary regulations to facilitate the voluntary services program; and (3) cannot resolve the statutory and constitutional claims raised on appeal. Id. The Appellate Court dismissed both appeals relying on the respondents' failure to exhaust administrative and statutory remedies. Id., 313.

Although we granted the respondents' petition for certification limited to the issue of whether the Appellate Court properly had dismissed the appeals on the grounds of failure to exhaust administrative remedies, our decision to affirm the judgment of the Appellate Court is based on our conclusion that the respondents were not aggrieved by the judgment of the trial court.[6]

---

[6] The Appellate Court's dismissal of the respondents' appeals was based on its determination that the respondents were required to exhaust administrative remedies prior to challenging the judgment of the trial court. *In re Shawn S.*, supra, 66 Conn. App. 313. We note, however, that the exhaustion doctrine is not implicated when one party petitions the trial court for commitment, thereby forcing the respondents to come before the court.

"The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. . . . The doctrine . . . furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency . . . in advance of possible judicial review. . . . Most important, a favorable out-

On appeal, the petitioner and the respondents both have briefed the issue of aggrievement.

As a threshold matter, we must address the standard of review. We have long held that "because '[a] determination regarding a trial court's subject matter jurisdiction is a question of law,' our review is plenary." *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999), quoting *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998); see *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 618, 674 A.2d 805 (1996).

The petitioner claims that because the respondents affirmatively and expressly agreed to the disposition of commitment, the respondents are not aggrieved by the trial court's judgments, and this court is without jurisdiction to entertain their appeal. We agree.

In order for a party to have standing to invoke the jurisdiction of the court, that party must be aggrieved. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring

come will render review by the court unnecessary [because] as the United States Supreme Court has noted: A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene." (Internal quotation marks omitted.) *Johnson* v. *Statewide Grievance Committee*, 248 Conn. 87, 95, 726 A.2d 1154 (1999).

The doctrine, therefore, applies only to a complaining party; id.; which, in the present case, is the department. The doctrine is inapplicable to a party that is already before a court in an action that it did not bring. The requirements of exhaustion would more appropriately apply to the petitioner, whereby the petitioner would be required to exhaust administrative remedies before bringing the commitment action. The doctrine logically cannot apply to the respondents, who are merely responding to an action brought against them.

suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) *Blumenthal* v. *Barnes*, 261 Conn. 434, 441–42, 804 A.2d 152 (2002).

While the respondents have clearly established the first prong of the aggrievement test, they have not satisfied the second prong. The first prong requires that the respondents demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest. The respondents unquestionably have a specific personal and legal interest in a decision whether to commit their children to the commissioner. The respondents have not, however, established the second prong, which requires that they establish that their interest has been specially and injuriously affected by the decision of the trial court.

The record contains the following facts that are relevant to our analysis of the second prong of the aggrievement test. At a hearing on August 2, 1999, the trial court heard testimony on the commissioner's petitions, and the respondent mother entered an unconditional plea of nolo contendere that S and D were uncared for because of their special needs. The court canvassed the respondent mother to confirm that she understood that the plea would operate as a waiver of her right to challenge the allegations that the children were uncared for as defined by the statute. The court found that the plea had been voluntarily, knowingly

and intelligently made with the assistance of counsel. Accordingly, the court adjudicated both S and D uncared for with specialized needs.[7] The case was then continued for disposition pending evidentiary hearings on placement options and available services.

On March 7, 2000, another hearing was conducted on the commitment petitions. The court, by reference to a status report, indicated that S and D were capable of being placed at the Devereaux School in West Chester, Pennsylvania. In light of the ability immediately to place S and D, the respondents asked that their motions for an injunction be marked off, allowing an order of commitment to be entered unchallenged, and allowing the children to be placed at the facility the next day. The fact that the respondents expressed their unhappiness at having their children committed does not change the fact that the commitment was a disposition to which the respondents agreed. Thus, the respondents are, per se, not aggrieved by the judgments of the trial court.[8]

Our conclusion that the respondents are not aggrieved, however, does not mean that they are without a mechanism for challenging the judgments of commitment. The respondents are fully entitled to seek revocation of the commitment pursuant to § 46b-129

[7] The respondent father has never objected to the trial court's adjudication of the children as uncared for, and the respondents are not challenging the unconditional plea of nolo contendere on appeal.

[8] Conceivably, the respondents could have satisfied the second prong of the aggrievement test if they had pursued their motion for injunctive relief, rather than marking it off. If the respondents had pursued their motion for injunctive relief, it is likely that they would have testified, offered expert testimony or offered other forms of evidence to establish the necessary factual predicate to prove the claims in their motion, which are exactly the same claims they have raised on appeal. The record before us, however, discloses only that the respondents affirmatively and expressly agreed to the disposition of commitment. The respondents are, in effect, asking us to infer facts not supported by the record. We decline to do so.

(m).[9] If the respondents seek revocation of the commitment pursuant to § 46b-129 (m) and are denied that relief, they would then be aggrieved and have an opportunity to appeal from the decision of the trial court.

We conclude that because the respondents affirmatively and expressly agreed to the disposition of commitment, they are, per se, not aggrieved by the judgments of the trial court.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[9] General Statutes § 46b-129 (m) provides in relevant part: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interest and welfare of such child or youth, the court may revoke the commitment of any child or youth. . . ."